AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>105 Blazing Court, Riverside, Ohio 45431 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 3 : 19 mj 219

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment C | See Attachment C |

The application is based on these facts:

See Attached Affidavit of Robert Buzzard

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Robert M. Buzzard_
*Applicant's signature*

Robert Buzzard, SA of the FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/15/19

_____
*Judge's signature*

City and state: Dayton, Ohio

Michael Newman, US Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

Your Affiant, Robert M. Buzzard, being duly sworn, do hereby depose and state as follows:

**<u>INTRODUCTION</u>**

1.     1.     Your Affiant is a Special Agent of the Federal Bureau of Investigation (FBI) and has been so employed since January, 2002.   Your Affiant is currently assigned to the Cincinnati Division, Dayton Resident Agency.   As such, your Affiant is charged with investigating crimes against the United States of America, including but not limited to violations of Title 18 and Title 21 of the United States Code (U.S.C.).   Your Affiant has received training in drug trafficking investigations and has participated in numerous narcotics-related investigations (ultimately leading to successful prosecution) that involved surveillance, gathering evidence of money laundering, interviewing suspected drug traffickers, and supervising the activities of informants who provided information and assistance which resulted in the seizure of narcotics. Your Affiant is familiar with federal drug laws, and is aware that it is a violation of Title 21, U.S.C., Sections 841(a)(1) and 846 to distribute and possess with intent to distribute controlled substances, as well as to conspire to do the same. Further, your Affiant is aware of federal firearm laws and knows that possessing firearms in furtherance of a drug trafficking crime is a violation of Title 18, U.S.C., Sections 924(c)(1)(A) and 2 and possessing a firearm by a convicted felon is a violation of Title 18 U.S.C. Sections 922(g)(1).

2.     This Affidavit is prepared and submitted in support of an application for a search warrant for a residence located at **105 Blazing Court, Riverside, Ohio 45431**, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location. **105 Blazing Court, Riverside, Ohio 45431** is more fully described in Attachment A, and Attachment A is incorporated herein by reference.   There is probable cause to believe that evidence of a crime; contraband, fruits of crime or other items illegally possessed; property designed for use, intended for use, or used in committing a crime - namely, 21 U.S.C. Section 846 (conspiracy to distribute and possess with intent to distribute a controlled substance); 21 U.S.C. Section 841(a)(1) (possession with intent to distribute a controlled substance); 18 U.S.C. Section 924(c)(1)(A) and 2 (possessing a firearm in furtherance of a drug trafficking crime); and 18 U.S.C. Section 922(g)(1) (possessing a firearm by a convicted felon) - exists and can be found at the residence located at **105 Blazing Court, Riverside, Ohio 45431**.   A list of the specific items to be seized from the premises described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference.   Based on my training and experience, as detailed above, I believe that there is probable cause to believe that the items listed in Attachment B will be found at the premises described above.

3.     The information contained in this Affidavit is largely based upon investigations conducted by your Affiant and other law enforcement officers.   All of the details of the investigation are not included in this Affidavit, only information necessary to establish probable cause that evidence associated with drug trafficking and firearms offenses are located at **105 Blazing Court, Riverside, Ohio 45431**.

1

4.      Based on your Affiant's aforementioned training and experience, Affiant is familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

a.      It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

b.      It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c.      That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d.      It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e.      It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f.      It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g.      It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h.      That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i.      When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j.    Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k.    It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l.    Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

m.    Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.    Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.    The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p.   Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q.   Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

r.   Your Affiant has repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

## INVESTIGATION

5.   The facts set forth in this affidavit include investigations by local and federal law enforcement agencies in Washington D.C. and Dayton, Ohio. The Washington D.C. investigation primarily focuses on gang shootings and firearm offenses while the Dayton, Ohio investigation focuses on both narcotics and firearms offenses.

## Washington D.C. Investigation:

6.   The Washington, D.C. Metropolitan Police Department and the FBI Washington, D.C. Safe Streets Task Force have been investigating the shooting of a father and his minor child that occurred on December 28, 2018. FBI Special Agent (SA) Catherine Hanna is the assigned case agent in the Washington D.C. Safe Streets Task Force investigation. As detailed below, the shooting is believed to have been a case of mistaken identity, in which the shooters targeted the father and his minor child because the vehicle in which they were seated looked like a vehicle used in a homicide (shooting) three days earlier. On March 8, 2019, three individuals – Darnell Savoy, Stefon Freshley, and Jamal Matthews, were arrested on charges of Assault With Intent To Kill, While Armed stemming from the December 28, 2018 shooting. Jamal Matthews was arrested by members of the Southern Ohio Safe Streets Task Force in Dayton, Ohio pursuant to a warrant issued in Washington D.C. Facts pertaining to the Washington D.C. shooting investigation are detailed as follows:

7.   On Friday, December 28, 2018, at approximately 1418 hours, ShotSpotter technology detected multiple gunshots in the area of the 5300 block of Blaine Street, Northeast, Washington, D.C. Sixth District officers responded to the scene and located a dark colored SUV that was riddled with approximately two dozen bullet holes. Victim-1 and Victim-2 were both on scene, suffering from multiple gunshot wounds. Victim-1 (the father of Victim-2) was outside of

the vehicle. Victim-2 (a minor child) was found inside the vehicle with an obvious gunshot wound to his head and multiple wounds to the left side of his body. Both Victim-1 and Victim-2 were transported to the hospital. Victim-2 was rushed into surgery in critical condition and Victim-1 was admitted in stable condition. Victim-2 was later transferred to Children's Hospital for additional surgeries. At the time of this warrant, Victim-2 is awaiting additional surgeries and is currently undergoing physical therapy. The crime scene was centered on a black GMC Acadia, with a Maryland Registration. The GMC Acadia is registered to Victim-1 (the father). This vehicle had multiple impact marks, consistent with gunfire, to the front grill, front windshield and along the driver's side of the vehicle. Outside of the vehicle, members located twenty-six (26) spent .223 REM PPU cartridge casings, among other items of evidence. Results received from forensic examination of the cartridge casings showed that the rifle used in this shooting was the same rifle used in a homicide that took place in August 2018. To date, the firearm has not been recovered.

8.     In the days following the shooting, detectives located multiple video cameras in the area surrounding the shooting. Footage from each of the video cameras was obtained and reviewed by Washington, D.C. detectives. The following is an excerpt from the timeline of events as depicted on the numerous videos (hereinafter, "Camera 1" through "Camera 7"), which show the events before and after the shooting of Victim-1 and Victim-2. On one of the cameras, identified as Camera 3, a black male in dark clothing enters the camera view as the victims' vehicle, the black GMC Acadia, and is staring in the direction of the vehicle as it passes him. While viewing this portion of the video, SA Hanna identified the person in the video as 'Stacks' or Jamal Omar Matthews. SA Hanna is familiar with Matthews from conducting extensive surveillance and investigation of Matthews in Washington D.C.

9.     Moments later, Matthews is observed utilizing a cell phone in his left hand while walking backwards still staring in the direction of the black SUV. Matthews turns and walks north along the west sidewalk, appearing to still be on the cellular phone until he walks out of the camera view. A few minutes later, Matthews re-appeared, this time carrying a black bag in his hand. Matthews was not carrying this bag when he left the view of the camera a few moments earlier. Matthews continued walking south, in the direction of the victims' vehicle. A silver vehicle, later identified as a 2015 Nissan Altima belonging to Darnell Savoy, stopped alongside of Matthews, who was walking on foot. Matthews entered the back door of the vehicle on the driver's side. The vehicle then continued moving and was captured on several cameras as it traveled, just prior to the ShotSpotter alert for the sound of gunshots.

10.     On March 7, 2019, arrest warrants were obtained for Matthews, Savoy, and Freshley in Washington, D.C. case number 2019-CRW-1400, charging them with Assault With Intent To Kill While Armed. During the investigation, detectives obtained information that Matthews may have left the area to stay with a family member in Ohio. Subsequent investigation showed that Matthews has an aunt, identified as Ebony Bailey, who resides at 105 Blazing Court, Riverside, Ohio.

11.     On March 8, 2019, your Affiant and members of the FBI SOSSTF initiated surveillance at 105 Blazing Court and observed Matthews exit the residence and enter a rental car that was parked in the driveway. Task Force members followed Matthews away from the

residence, where Dayton Police officers conducted a traffic stop on the vehicle that Matthews was driving. Matthews was taken into custody on the outstanding arrest warrant. Matthews requested task force members contact his aunt, Ebony Bailey, at telephone number (202) 421-4016 to inform her of his arrest. Matthews also requested your Affiant return a Lexus car key to Bailey, which he possessed at the time of his arrest. Matthews was transported to the Montgomery County Jail, where he was held until March 14, 2019, when he was transferred to the Butler County Jail.

12.     On March 9, 2019, Detectives from Washington D.C. MPD and your Affiant interviewed Bailey outside of her residence at 105 Blazing Court, Riverside, Ohio. During the interview, Bailey acknowledge Matthews had been staying with her at the residence. Your Affiant released the Lexus key to Bailey that Matthews possessed at the time of his arrest. Bailey acknowledge the key belonged to a car she owned. Your Affiant also knew from prior surveillance at 105 Blazing Court that Bailey had a 2002 black Lexus sedan, bearing Washington D.C. license plate EF8978 registered to her. Specifically, your Affiant observed that vehicle parked in the driveway at 105 Blazing Court on February 11, 2019.

13.     Since Matthews' arrest, officers and agents in Washington, D.C. have reviewed the recorded calls made by Matthews from the Montgomery and Butler County Jails. Several calls contained what were believed to be conversation in which Matthews and the other parties attempted to "code" language regarding a firearm Matthews left in Bailey's residence at 105 Blazing Court. The following are excerpts of transcribed conversations between Jamal Matthews and Dameshia Cooper on March 8, 2019; and Jamal Matthews and Ebony Bailey on March 8, 9, 2019:

a. On March 8, 2019, at approximately 2:23 p.m., Matthews placed an outgoing call from the Montgomery County Jail to Cooper, his girlfriend, who used telephone number (202) 246-7844, and had the following conversation:

> **Matthews: Text EB for me, and tell her, man, tell her I left the motherfucking demonstration there.**
> **Cooper: Huh?**
> **Matthews: Text EB and tell her the demonstration in her living room.**

SA Hanna understood "EB" to be a reference to Ebony Bailey. Further, SA Hanna understands the word "demonstration" to be a word commonly used in Washington, D.C. vernacular to describe a firearm. In 2012, in the matter of *United States v. Mark Pray*, 10-cr-51-RMC, in the United States District Court for the District of Columbia, SA Hanna was qualified as an expert witness in the interpretation of words and phrases used by narcotics traffickers.

b. At approximately 3:05 p.m. on March 8, Matthews placed an outgoing call from the Montgomery County Jail to Bailey, who used telephone number (202) 421-4016, which is the number Matthews provided for her to law enforcement upon his arrest. Matthews and Bailey had the following conversation:

> **Matthews: They coulda been extra geekin', man. Ran all in the spot. N****** woulda been sick.**
> **Bailey: Probably 'cause it's military housing.**

> **Matthews:** Probably know them military motherfuckers got guns and shit in there.
> **Bailey:** Man, he asking me, like, what's your phone number, how long you been here, all of this shit. I'm like, I don't know.
> **Matthews:** For real?
> **Bailey:** I'm like, I mean, he call me from different numbers. I gotta look in my phone for it.
> **Matthews:** Man, slim.
> **Bailey:** (UI) said somebody was all the way in fucking Ohio!
> **Matthews:** In the paper they had your name on the shit, bro.
> **Bailey:** On the paper?
> **Matthews:** Yeah; like, you my aunt.
> **Bailey:** Oh, my god. That shit crazy. They want y'all bad, boy.
> **Matthews:** I can't believe this shit, mo. I shoulda fucking fled. Then, I'm on FaceTime with Danei – with Nee –
> **Bailey:** Thank god! Shit. Somebody knew something.
> **Matthews:** I'm glad I ain't have no demonstration with me.
> **Bailey:** Goddamn. That's all I could think about right there.
> **Matthews:** The demon –
> **Bailey:** Yes. Like, the fuck?
> **Matthews:** I didn't even have shit on me.

c. The following morning, on March 9, 2019, Matthews placed an outgoing call from the Montgomery County Jail to Bailey on the same phone number. The following is an excerpt from that conversation:

> **Matthews:** You back yet?
> **Bailey:** Yep; we just got back at, like, five something in the morning. We drove straight. David drove –
> **Matthews:** You got the demonstration out the living room?
> **Bailey:** Yeah. Umm-hmm. Yep.
> **Matthews:** Oh, alright. I was about to ride with it. I'm like, I'm going to go to the other spot and jump in the shower. Take care of that business.

Despite Bailey's response to Matthews' question on March 9, when agents believe he asked her if she had removed the firearm he left in her living room ("Yeah. Umm-hmm. Yep."), subsequent conversation indicated that the firearm was still in her residence. Agents also noted in that conversation Matthews stated, "I'm going to go to the other spot and jump in the shower" eluding to Bailey and Matthews having a second residence.

d. On March 14, 2019, Matthews placed an outgoing call to Bailey, who told Matthews that she was in Washington, D.C. at her mother's residence with some other family members. During that call, Bailey shared her telephone with others who were in the house with her at that time. One of the individuals was not identified by name and is referred to below as "Unknown Male". Before Bailey handed her phone to the Unknown Male, she and Matthews had the following exchange:

> **Bailey: Hold on. (Laughs). He was asking, talking about, where that shit I gave**
> **him, so I can get it back? I'm like, I don't know!**
> **Matthews: It's in your living room, EB.**

This exchange implied that the firearm remained in Bailey's residence, specifically in the living room. After this exchange, Bailey handed her phone to the unknown male who was with Bailey at her mother's residence in Washington, D.C.   During the conversation between Matthews and the unknown male, they had the following exchange:

> **Matthews: That demonstration – that demonstration in EB's living room, too,**
> **though.**
> **Unknown Male: Alright. Don't even sweat that shit, cuz. Don't even sweat that.**
> **Matthews:   It's still crazy – (UI)**
> **Unknown Male:   Just stay calm. Nah, just stay calm, cuz. We'll get you what**
> **you need once you get here. You hear me?**

14.     Your Affiant has reviewed Matthews' criminal history and knows him to be a convicted felon prohibited from possessing a firearm.  Specifically, in October 2014, Matthews was sentenced in D.C. Superior Court case number 2012CF2014324 for felony possession of liquid PCP.   In December 2016, Matthews was sentenced in D.C. Superior Court for unlawful possession of a firearm (prior felony conviction).

**Dayton, Ohio Investigation:**

15.     On April 7, 2019, officers of the Dayton, Ohio Police Department were dispatched to a residence at 14 Reisinger Avenue, Dayton, Ohio on a reported burglary alarm.  Upon arrival, officers noted the front door to the residence had been kicked in.  Officers also noted a doorbell camera and what appeared to be another alarm system laying in the grass close to the residence. Officers made entry into the residence to check for suspects and or check on the welfare of any residents.  Upon entering the residence, officers noted the odor of marijuana.  While conducting a security sweep of the residence, officers observed in plain view marijuana (Schedule I controlled substance) in a first floor kitchen closet, THC edibles in a first floor closet near the kitchen, and a Glock handgun laying next to a bed in an upstairs bedroom.  Officers also noted Ebony Bailey's black Lexus sedan, bearing Washington D.C. license plate number EF8978, was parked in front of the residence.

16.     No one was located in the residence and officers contacted detectives with the Dayton Police Department Narcotics Unit due to the items they observed during the protective sweep.  Officers on scene also checked the address for prior police reports and noted that on March 6, 2019, a burglary report was made listing Ebony Bailey as a complainant.  Prior to the arrival of detectives, a known male individual showed up at the residence and told officers he had been sent to the residence by Ebony Bailey to secure the front door.  Approximately five minutes later, a known female showed up at the residence and told officers that Ebony Bailey had called her and told her to also go to the residence and secure the front door.  Dayton Narcotics Detective Ronald Gustwiller arrived at the residence and interviewed the female and the male who showed

8

up at the residence to secure the front door on Bailey's behalf.  Officers secured the residence while Dayton Narcotics Detective Mistan Bailey obtained a search warrant.  Dayton Municipal Judge Carl S. Henderson subsequently authorized the search warrant for 14 Reisinger Avenue.

17.    While serving the search warrant, detectives noted the residence appeared to be a stash house for a significant liquid THC distribution operation.  In addition to large quantities of THC liquid being inside the residence, detectives noted the front door of the residence had been barricaded, there were security cameras, one or more of the windows contained security bars, and there were several firearms present for protection.  More specifically, detectives located and seized six boxes and one suitcase containing THC liquid with a total weight of approximately over 200 pounds.  Additional baggies containing marijuana were also found in the residence along with a Glock 19 semi-automatic handgun, a Master Piece Arms 9mm handgun, a Taurus .357 caliber revolver, ammunition, and a Norinco 7.62 X 39 caliber rifle.  The Norinco rifle was found concealed in a couch/ottoman that also contained over $70,000 in U.S. currency.  An electronic money counter was also found inside the residence and seized.

18.    Detectives also seized several possessory items and documents inside the residence.  In part, those items included; Jamal Matthews' social security card, his birth certificate, a Penfed Credit Union letter addressed to Jamal Matthews at 5116 Fitch St. SE Apt. 1, Washington, D.C., Ebony Bailey's Ohio identification card (listing her address as 105 Blazing Ct.), and a Spectrum bill/correspondence addressed to "Eboney Bailey" at 105 Blazing Ct.  Detectives also located a purchase invoice from "THClear" dated March 6, 2019.  The invoice was for multiple marijuana edibles and liquid THC totaling over $10,000.00.  The "Bill To" portion of the invoice listed "Magic Dragon, Meet Driver in LA."

19.    On April 10, 2019, your Affiant contacted a representative of The Properties at Wright Field who manages/leases the residence at 105 Blazing Ct., Riverside, Ohio.  The representative identified Ebony Bailey as the current resident/lessee of 105 Blazing Ct., Riverside, Ohio.  Bailey has leased the residence since October 2017.

//

//

//

//

20.     Based on the facts set forth in the Affidavit, your Affiant believes there is probable cause to believe that evidence associated with the above listed drug trafficking and firearm offenses is located at **105 Blazing Ct., Riverside, Ohio**.

Robert M. Buzzard
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 15th day of April, 2019.

MICHAEL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

**Attachment A**

105 Blazing Court, Riverside, Ohio 45431 is a two-story single family residence constructed of wood siding that is off white and gray in color.  The numbers "105" appear affixed to the front of the residence directly right of the garage door.  A photo of the residence appears below.



ATTACHMENT B

I submit that there is probable cause to search for the following
items:

    A.    Log books, records, payment receipts, notes, and/or customer
        lists, ledgers, and other papers or electronic records
        relating to the transportation, ordering, purchasing,
        processing, and distribution of controlled substances.

    B.    Papers, tickets, notices, credit card receipts, travel
        schedules, travel receipts, passports, and/or records, and
        other items relating to domestic and foreign travel to obtain
        and distribute narcotics and narcotics proceeds, including,
        but not limited to airline receipts, vehicle rental receipts,
        credit card receipts, travel schedules, diaries, hotel
        receipts, truck logs, travel agency vouchers, notes, records
        of long distance telephone calls, e-mail and other
        correspondence.

    C.    Address and/or telephone books and papers reflecting names,
        e-mail and physical addresses and/or telephone numbers of
        individuals, partnerships, or corporations involved in drug
        trafficking and money laundering.

    D.    Financial records, financial statements, receipts, statements
        of accounts and related bank records, money, drafts, letters
        of credit, money orders and cashier's checks receipts,
        passbooks, bank checks, escrow documents, and other items

evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.    Electronic equipment such as pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

F.    United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.    Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H.    Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

I.    Illegal drugs, including, but not limited to cocaine, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

J.    Firearms and ammunition.

K.   Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

L.   Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations,

ATTACHMENT C

a.    Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

b.    Conspiracy to commit offenses under Title 21, in violation of Title 21, United States Code, Section 846;

c.    Felon in possession of a firearm, in violation of Title 18, United States Code, Sections 922(g)(1);

d.    Possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c).